NAPIER v. SPIELMANN et al.

(Supreme Court, Appellate Division, First Department.    July 8, 1908.)

1. APPEAL AND ERROR—GRANTING NEW TRIAL—REVIEW.

Where the record shows prejudicial errors excepted to by the defeated party, the act of the court in setting aside the verdict and granting a new trial cannot be reversed, though the appellate court does not agree with some of the views of the trial court as stated in the opinion delivered on motion for new trial.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 3423, 3424.]

2. DAMAGES—BREACH OF CONTRACT.

A contract bound plaintiff to procure the consignment to defendant of the product of silk mills, to attend to the sale of the consigned goods, and to keep a competent force for that purpose and bound defendant to provide a storeroom and pay plaintiff a commission on the sale of the product. The contract further provided that the agreement should continue for a year, and thereafter from year to year unless terminated by three months' notice prior to the expiration of a year, and that at its termination defendant might close the store and sell the goods, without containing a provision giving plaintiff commissions on such sales. *Held*, that plaintiff, seeking damages for breach by defendant, must allow a deduction for the expenses which he would have incurred in carrying out his part of the contract, and he could not, after breach, continue others in his employ and claim a reimbursement therefor from defendant, and he was not entitled to commissions on goods unsold at the expiration of a year on the giving of notice for the termination of the contract.

3. CONTRACTS—PAROL MODIFICATION—CONSIDERATION—VALIDITY.

Plaintiff contracted to procure the consignment to defendant of the product of silk mills, and defendant agreed to pay a commission on the sale of the product consigned. While the contract was in force, subject to termination on a designated date on notice, plaintiff informed defendant of his inability to procure the entire product of the mills and of his intention to terminate the contract. Defendant induced plaintiff not to terminate the contract, and orally agreed to relieve him from his obligation to procure the assignment of the entire product of the plants, and plaintiff agreed to continue to control some of the output of the mills and have the same consigned to defendant. *Held*, that the parol modification, being supported by a valid consideration, bound plaintiff to continue to consign to defendant some of the output of the mills, but he was relieved from his obligation to consign the entire output.

111 N.Y.S.—64

**4. SAME.**

A parol modification of a contract, supported by a valid consideration, cannot be canceled by either party, with a view of restoring the original contract, without the consent of the other.

**5. SAME—BREACH—RIGHTS OF PARTIES—"NEGLECT AND REFUSAL."**

Plaintiff contracted to procure consignment to defendant of some of the product of silk mills, and defendant agreed to pay commissions on the sale of the product consigned. The contract was to continue for a year, and thereafter from year to year until terminated by notice, and it provided that on "neglect and refusal" of plaintiff to perform his agreement, and at the expiration of the agreement, defendant might sell the goods on hand. The company owning the mills refused to consign any product to defendant so long as plaintiff was retained as sales agent, and defendant was so notified. *Held*, that plaintiff, on being unable to continue to consign goods, was guilty of a breach of contract, the inability to continue not being "neglect and refusal," and defendant was justified in canceling the contract for the future, and might enter into a contract with the company for the consignment of future goods.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 1174, 1175.

For other definitions, see Words and Phrases, vol. 5, pp. 4741, 4742.]

**6. DAMAGES—BREACH OF CONTRACT.**

A party contracting to procure the consignment to the adverse party of some of the products of silk mills, and to attend to the sale of the product consigned for a commission to be paid by the adverse party, is entitled to a reasonable opportunity to continue to procure the consignment of goods from the mills, and, on the adverse party wrongfully terminating the contract, on the theory that the party is unable to continue it, he is entitled as damages to the value of his contract, which is such commissions as he could have earned had the contract continued, less the expenses incurred in performing it, while, if unable to continue, his recovery is limited to commissions on goods previously procured and sold prior to the termination of the contract, minus the cost of making the sale.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, § 292.]

Appeal from Trial Term.

Action by Thomas S. Napier against Charles Spielmann and others, composing the firm of Spielmann & Co. From an order (54 Misc. Rep. 96, 103 N. Y. Supp. 982) setting aside a verdict for plaintiff and granting a new trial on the exceptions taken during the trial, and on the ground that the verdict is contrary to law, plaintiff appeals. Affirmed.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

J. Noble Hayes, for appellant.
Charles E. Rushmore, for respondents.

LAUGHLIN, J. The record shows errors prejudicial to the defendants, to which they duly excepted, and therefore the action of the court in setting aside the verdict and granting a new trial cannot be reversed; but, inasmuch as we do not agree with some of the views expressed by the learned trial justice in the opinion delivered on the motion for a new trial, it is proper and advisable that we should express our views concerning the merits of the case as presented by the record for the guidance of the court on a new trial.

The action is to recover damages for the breach of a contract made between the plaintiff and the defendants. The original contract was in writing. It was executed in the month of July in the year 1900, and by its terms it was to become operative on the 1st day of August thereafter. It recites that the plaintiff was a member of the firm of Westerhoff Bros. & Napier, manufacturers of silk goods at Paterson, N. J., and Ephrata, Pa.; that his firm also managed and controlled the Pennsylvania Silk Company, of Fleetwood, Pa., and desired through him to make a business arrangement and contract whereby they might obtain from the defendants certain financial and commercial advantages in connection with the business to be conducted by the plaintiff. The plaintiff agreed that his firm, during the continuance of the contract, would consign the entire manufactured product of its respective plants and of the Pennsylvania Silk Company to the defendants; that he would attend to the sale of the consigned goods, and engage and keep a competent force for handling and selling the same, including competent traveling salesmen, and would defray all of the expenses thereof. The defendants agreed with the plaintiff to advance to his firm 66⅔ per cent. of the net market value of the goods at the time of the consignment thereof, upon which they were to receive interest at the rate of 6 per centum per annum; that defendants should, at their own expense, provide a porter and an entry clerk and ordinary stationery, such as they then provided for their other manufacturers having similar accounts with them, and should keep the goods insured; that the defendants should at their own expense provide an annex to their existing business for the consignment and sale of the goods. It was mutually agreed that the goods should be consigned in the name of the defendants, and, when sold, be billed in their name, and that the invoices should be payable to them; that there should be deducted from the account sales rendered to the respective consignors and retained by the defendants a commission of 7½ per cent. on the net amount of sales, after deducting the cash discount allowed to customers; that out of this commission the defendants should receive a commission of 3½ per cent. upon the gross amount of sales in full for their guaranty upon the sales and the expenses to be borne by them, and for supplying the financial and commercial advantages provided for in the agreement; that the defendants should be the sole judge of credits to be extended on sales; that the defendants should furnish monthly accounts of sales to the respective mills from which goods were consigned and semiannual accounts current of the business done, on which interest should be figured "pro and con at the rate of six (6) per cent. per annum"; that for the purpose of fixing the credit to the respective mills the account sales should bear "maturity in accordance with the terms of sales allowed customers," and that there should be added thereto 25 days to compensate defendants for slow collections; that the defendants should advance to plaintiff the sum of $1,000 each month to cover the traveling expenses and salaries incurred by him, which should be charged to his account; that defendants should have the customary lien of a del credere commission house for its advances,

commissions, and charges; that defendants should have sole control and possession of the merchandise while the agreement remained in force and until all advances, charges, and commissions owing to it shall have been fully paid and discharged; that in the event of the inability of the respective consignors to pay and reimburse the defendants for advances made, after reasonable demand on the plaintiff therefor, and in the event of neglect and refusal on the part of the plaintiff to perform any of the terms of the agreement, and at the expiration of the agreement, the defendants should have "the absolute right to sell all goods remaining on hand, either at private sale or public auction, at the best prices obtainable therefor, and shall give notice of the time and place of sale to the party of the first part by registered mail, and out of the proceeds of such sale" the defendants should reimburse themselves for all amounts due by the respective consignors, including the selling expenses, "and pay over any surplus to the respective consignors, or their legal representatives"; that there should be a sign in front of the annex where the goods should be sold, which should read "Annex of Spielmann & Co." It was further provided that, should the defendants make arrangements with Charles G. Runyon, they should have the right to devote a portion of the annex to the sale of the goods made by his manufacturers and that he should have the services of the porter and entry clerk. It was agreed that the contract should become operative on the 1st day of August, 1900, and continue for one year, "and shall thereafter continue from year to year unless either of the parties hereto shall, within three months before the 1st of August in any year, give notice of their intention to discontinue the same." It was further provided that, should the plaintiff succeed "in obtaining control of other accounts of silk goods, consignments thereof will be accepted" by the defendants "upon terms similar to those herein agreed, except as to accounts of silk manufactured at Lyons, France."

The members of the firm of Westerhoff Bros. & Napier were Peter D. and Henry Westerhoff and the plaintiff, and each had a one-third interest therein. It is alleged in the complaint that the contract was made in contemplation of an arrangement between the members of the firm to incorporate their business under the name of "Westerhoff Bros. & Napier Company"; that the corporation was formed on the 3d day of August, 1900, and the firm business was turned over to it; that the firm and corporation impliedly recognized and adopted the contract, in so far as it related to them and their business, by accepting the financial assistance and consigning goods; that the business was established and continued as contemplated by the contract between plaintiff and defendants until the year 1902, when defendants complained that plaintiff's corporation was not consigning the entire product of its mills to them, and that thereafter plaintiff informed defendants that he would be unable to carry out his contract to procure the consignment to defendants "of the entire product of the mills" of his corporation, and for that reason should be obliged to abandon the contract to save himself from loss; that thereupon defendants requested him not to abandon it, and agreed that the contract should continue

from year to year as therein provided, "without enforcing against him the provision which required him to procure the consignment to them of the entire product of the mills" of his corporation; that "he acquiesced in this, and that the contract, as thus modified, continued in force until the 19th day of October, 1904, without notice given by either party to terminate it, on which day the defendants wrongfully broke and terminated the contract and refused to employ plaintiff to sell the goods theretofore consigned by his corporation, or to accord to him any of his rights under the contract, or to permit him to act as selling agent of or to sell the goods consigned by his corporation, or to pay him commissions thereon, and procured the assistance of his former copartners to enable them to more effectually prevent plaintiff from performing the contract on his part; that since the breach of the contract the defendants have continued to receive consignments of silk goods from plaintiff's corporation, and are still acting as the commission house thereof; that defendants have thereby deprived plaintiff of receiving or earning any commissions under the contract from the date of the breach thereof to the 1st day of August, 1905, that being the date on which it could have been lawfully terminated by the defendants, to his damage in the sum of $33,440, being for commissions aggregating $6,500 on goods consigned on or prior to the date of the breach, and for $26,940 prospective profits on accounts since consigned and to be consigned prior to the 1st day of August, 1905.

The action was commenced on the 25th day of March, 1905. The plaintiff showed the value of the goods on hand in the annex on the 19th day of October, 1904, and that his commissions thereon, if entitled thereto pursuant to the contract, aggregated $4,024.28. He also showed the value of the goods consigned by his corporation to the defendants between the 19th day of October, 1904, and the 1st day of August thereafter, and his commissions thereon at the rate prescribed in the contract would aggregate $11,487.26, making a total of $15,511.54, which he claimed as his damages. It is conceded by counsel for the appellant, although the figures do not quite agree, that this is the basis upon which the jury rendered their verdict, deducting from the commissions claimed by plaintiff defendants' second and third counterclaims, amounting to $2,428.70. It thus appears that the jury awarded the plaintiff full commissions on the goods on hand at the date of the alleged breach of the contract, and on all goods consigned to the defendants by his corporation thereafter down to the 1st day of August, 1905, although a large part of such consigned goods were still on hand unsold at that time, and without any deduction for the expenses which would have been incurred by the plaintiff in selling the goods, and of which he was relieved when the defendants refused to further recognize his rights under the contract. It is manifest that in no view of the case, even if the defendants unlawfully terminated the contract, was the plaintiff entitled to this entire recovery. If plaintiff had performed the contract, he would necessarily have incurred a large amount of expense, as is indicated by the monthly advancement of $1,000 on account thereof.

He was not obligated to, nor justified in continuing in his employ, after a total breach of the contract by the defendants, the services of others, and his claim to reimbursement therefor from defendants is untenable. Moreover, if he had performed the contract, he would not have been entitled to commissions on goods on hand or unsold on the 1st day of August, 1905, provided either party had given due notice thereunder to terminate it on that day. The contract contemplates that at its expiration the defendants should have the right to close the annex at once and provide for a sale of the goods, and that they shall account to the consignors therefor, and contains no provision giving plaintiff any right to commissions on such sales.

We do not agree with the contention that the defendants were at liberty, after consenting to a modification of the contract relieving the plaintiff from his obligation to procure the consignment of the entire output of his company's plants, to restore that obligation at will and to terminate the contract at the time they did on account of his inability to perform that covenant, which would make him guilty of a breach of the contract and prevent a recovery. The evidence shows that plaintiff and his copartners, who held practically the same interest in the corporation as they did in the firm, were not in accord, and they, being in control of the corporation, asserted their right to sell the output of their plants to whom they pleased. Although the contract was renewed from year to year by the failure of either party to give notice to terminate it, yet it will be remembered that neither plaintiff's firm nor company was a party thereto. His company therefore, was not bound, as between it and the defendants, to continue to consign the whole or any part of their manufactured silk product to the defendants. The plaintiff, on being informed that his company was consigning and selling silk goods elsewhere, endeavored to persuade his former copartners, who controlled the corporation, to desist, and to consign the entire output to the defendants. In this he was unsuccessful. He then informed the defendants of his inability to perform his covenant in that regard and of his intention to terminate the contract to relieve himself of personal liability to them. They dissuaded him from taking this course. He could then have given notice, which would have been effectual to terminate the contract on the 1st day of August thereafter. This the defendants induced him to refrain from doing. That was a good consideration for the parol modification of the contract, and once a parol agreement, founded upon that consideration, for a modification of the contract was made, it could not be canceled by either party, and the original provision of the contract before modification restored, without the consent of the other.

It appears, however, by the testimony of the plaintiff, that the only modification of the contract agreed upon between him and the defendants was with respect to the quantity of goods to be consigned by his company. All of the other terms and provisions of the contract remained in force. It is not even alleged that the defendants agreed to continue the contract in the event that plaintiff should be unable to obtain the consignment of any goods from his company.

The basis of the contract was the consignment of goods from his firm and corporation. The original contract required the plaintiff to procure the consignment of the entire output of his firm's plants. The contract, as modified, according to his own testimony, did not release him from obtaining the consignment of any of the output of his company; but, on the contrary, it was expressly provided that defendants should not lose the account with his company. He testified that defendant Spielmann said to him:

"We do not expect you—we won't hold you to giving us all the goods, provided you don't lose the account. We want to keep this account. It is a good one."

To which he replied:

"Well, I will go on under those conditions, under that arrangement, Mr. Spielmann, absolutely."

This obligated the plaintiff to continue to control some of the output of his company's plants and to have it consigned to them. The evidence in this regard shows that prior to the 19th day of October, 1904, the date of the alleged breach of the contract, the plaintiff was unable to further procure any consignment of goods to the defendants from his company. On the 1st day of February, 1904, at the annual meeting of the directors of plaintiff's company, a resolution was adopted that the plaintiff "receive $1,350 per year for managing and superintending the selling end of the business of said Westerhoff Bros. & Napier Company in New York City." The plaintiff was secretary of his company. On the 10th day of October, 1904, at a meeting of the board of directors of his company, at which four directors were present, the minutes of which were kept by the plaintiff, the following resolution was adopted by a vote of three to one:

"Whereas, the selling end of Westerhoff Bros. & Napier Company, conducted by Thomas S. Napier at 31 Greene street, New York City, has proven unsatisfactory during the past year, and it seems to be to the interest of the said company that a change be made in the said selling department at 31 Greene street, New York City: Therefore, be it resolved that the said Westerhoff Bros. & Napier Company empower the president to hire and employ such men as he may deem necessary to sell any and all goods in the said store, or to transfer any stock and merchandise now in the said store, or that may hereafter be shipped there by said company; and be it further resolved that the services of the said T. S. Napier as salesman in the said store be and the same are hereby dispensed with, and his salary to cease and be discontinued from and after the 16th day of October, 1904."

It appears that within a few days thereafter, and prior to the 19th day of October, 1904, the defendant Spielmann was informed by one of the Westerhoff Bros. of this action, and that the company would not consign any more goods to the defendants so long as the defendants retained the plaintiff as their sales agent. Evidence was given by the plaintiff tending to show that on the morning of the 19th of October, 1904, his company placed another sales agent in charge of its goods theretofore consigned to the defendants and then in the annex provided by the defendants for the sale of such consigned goods, and that either the defendants, or his company, or both, thereupon ejected him from the annex and denied him entrance thereto. There-

after the sales agent so installed in his place continued to sell the goods on hand, and plaintiff's company continued to consign goods to the defendants, and on the 16th day of November of the same year a contract in writing was made between the company and the defendants for the consignment by the company to defendants of the entire output of all its plants on substantially the same terms as those embodied in the contract between plaintiff and the defendants, but with a provision, however, that the goods were to be sold by an agent to be approved by both parties. The defendants permitted the sale of the goods on hand October 19, 1904, and thereafter consigned by agents with whom plaintiff's company contracted; such agents receiving commissions through defendants on virtually the same basis as that embodied in plaintiff's contract with defendants.

Upon the trial, and on the appeal, the learned counsel for the plaintiff contended that the evidence showed a conspiracy between the defendants and plaintiff's company to deprive plaintiff of the benefit of his contract. We find no evidence in the record to sustain that charge. The defendants were, of course, interested in retaining the account of plaintiff's company, and, on finding that plaintiff was no longer able to control it, they had a perfect right to terminate their relations with him, for that was the condition upon which the contract in the modified form was continued, and to enter into a contract with his company which would insure to them the continuance of the business, and in doing so they are not justly subject to the charge of having conspired to deprive the plaintiff of his contract rights. The plaintiff, being unable to continue the account, was guilty of a breach of the contract as modified. The express provisions of the original contract were not applicable to such a condition as then existed. Inability to continue the account was not "neglect and refusal" on the part of plaintiff to perform his contract; but it was a breach of the contract as modified, which would justify defendants in canceling the contract relations for the future. The plaintiff's right to have other goods consigned to defendants on the same terms could not survive a breach of his contract to continue his company's account. Of course, the defendants were obligated to afford plaintiff a reasonable opportunity to continue the account of his company, and in acting on the assumption that he could not continue it, without consulting him, they took chances on his ability to show ability to perform. Doubtless it cannot be said as matter of law that he was unable to retain the account. That would likely be a question of fact for the jury to determine; and, should it be determined in his favor, he would be entitled to recover as damages the value of his contract, which would be what he would have made by performance, and that would be such commissions as he could show he would have earned prior to August 1, 1905, had defendants not deprived him of his right to have the contract continued until that time, less the expenses that would have been incurred by him in performing the contract. Dunham v. Hastings Pavement Co., 95 App. Div. 360, 88 N. Y. Supp. 835. If plaintiff was unable to continue the account of his company, then his right of recovery would be confined to commissions on goods sold prior to that time and on goods the consignment of which he had previous-

ly procured, and which he would have been able to sell using reasonable diligence up to August 1st, when the contract would have terminated, less the cost of making such sales. Of course, we do not intend to attempt to anticipate what the evidence may be upon a new trial, and we are merely expressing our views with respect to the plaintiff's rights on the record now before us.

It follows that the order should be affirmed, with costs. All concur.